# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-14-00375-CV

**Auspro Enterprises, LP, Appellant**

**v.**

**Texas Department of Transportation, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
## NO. D-1-GN-11-002740, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment dated August 26, 2016, substitute the following opinion and judgment in their place, and deny the Department's motion for rehearing.

This case addresses the constitutionality of the Texas Highway Beautification Act.[1] The United States Supreme Court recently struck down a similar sign regulation in *Reed v. Town of Gilbert*, where the high court observed:

> This type of ordinance may seem like a perfectly rational way to regulate signs, but a clear and firm rule governing content neutrality is an essential means of

---

[1] Tex. Transp. Code Ch. 391.

protecting the freedom of speech, even if laws that might seem "entirely reasonable" will sometimes be "struck down because of their content-based nature."[2]

In *Reed*, the Supreme Court refined its framework for analyzing "content based" regulations of speech, holding, "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."[3] With this holding and broad framework for determining whether a government regulation of speech is "content based," *Reed* has arguably transformed First Amendment free-speech jurisprudence.

In *Reed*'s wake, our principal issue here is not whether the Texas Highway Beautification Act's outdoor-advertising regulations violate the First Amendment, but to what extent. Based on our determination that, under *Reed*, certain provisions in Subchapters B and C of the Act are facially content-based restrictions on speech that render those subchapters unconstitutional, we will reverse the district court's judgment and render judgment severing those unconstitutional subchapters from the Texas Highway Beautification Act.

## Background

The facts of this case are straightforward and undisputed. On July 7, 2011, Auspro Enterprises, LP, placed a sign supporting Ron Paul's 2012 presidential campaign on its property on State Highway 71 West in Bee Cave, Texas. On July 12, the Texas Department of Transportation

---

[2] 135 S. Ct. 2218, 2231 (2015) (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)).

[3] *Id.* at 2222.

sent a letter to Auspro explaining that its sign was "illegal" because all outdoor signs must be permitted and, although there is a specific exemption under Department rules for political signs, the exemption only allows political signs to be displayed 90 days before and 10 days after an election.[4] The Department's letter ordered Auspro to remove the sign.

After Auspro failed to remove the sign, the Department brought an enforcement action in Travis County District Court for injunctive relief and civil penalties. In response, Auspro asserted that the Texas Highway Beautification Act and the Department's implementing rules violate, both facially and as applied, Auspro's right to free speech under the U.S. and Texas constitutions.[5] The district court granted final judgment in the Department's favor after a bench trial on stipulated facts, specifically concluding, among other things, that the Act and the Department's rules were not unconstitutional as applied to Auspro.[6]

During Auspro's appeal from the district court's final judgment, the United States Supreme Court granted certiori and heard oral argument in *Reed*, prompting this Court to grant Auspro's motion to abate this appeal pending the resolution of *Reed*. Following the *Reed* decision

---

[4] The Department's letter set forth, in their entirety, the Department rules requiring permits for outdoor advertising and granting an exception for campaign signs. *See* 43 Tex. Admin. Code §§ 21.143(1) (2011) (Tex. Dep't Transp., Permit Required), 21.146(a)(9) (Exempt Signs); *see also* Tex. Transp. Code § 391.005 (election-sign exemption).

[5] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."); Tex. Const. art. I, § 8 ("Every person shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press.").

[6] The judgment did not include a specific finding regarding Auspro's facial challenge.

and with the benefit of its instruction, we reinstated this appeal and allowed the parties to submit briefs regarding *Reed*'s effect on our decision here.

## Analysis

Auspro brings three issues on appeal, but its principal contention post-*Reed* is that the Texas Highway Beautification Act violates the First Amendment because it is a "content-based" government regulation of speech that cannot survive strict scrutiny.[7] The Department, in turn, maintains that *Reed* does not inform our decision, arguing that the Texas Act actually favors election signs and that, relatedly, we remain bound by the Texas Supreme Court's 2003 decision in *Texas Department of Transportation v. Barber*, which held that the Texas Highway Beautification Act is constitutional.[8] In the alternative, the Department maintains that our constitutional inquiry here is limited to the election-sign exemption and that our sole remedy, should we determine that provision is unconstitutional, is severing that exemption from the Act.

**Free-speech jurisprudence, *Reed*, and its aftermath**

The First Amendment mandates that "Congress shall make no law . . . abridging the freedom of speech."[9] The Supreme Court has interpreted this language to generally prohibit any laws that regulate or restrict expression based on content: "[A]bove all else, the First Amendment

---

[7] "Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the First Amendment and simply assume that its concerns are congruent with those of article I, section 8." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).

[8] *See* 111 S.W.3d 86 (Tex. 2003).

[9] U.S. Const. amend. I.

means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[10] Such "content-based" regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[11] Because this strict-scrutiny inquiry is almost impossible to overcome—"It is rare that a regulation restricting speech because of its content will ever be permissible"[12]—the primary, and often dispositive, question in a free-speech analysis is whether the law in question is content based or content neutral. Regulations deemed content neutral—i.e., that regulate speech without regard to its content—are subject to the less exacting intermediate scrutiny, which requires that the law in question not be "substantially broader than necessary to achieve the government's interest."[13] *Reed* is the Supreme Court's most recent articulation of its standard for determining whether a particular government regulation of speech is content based.

The government regulation of speech addressed in *Reed* was a sign ordinance that banned the display of outdoor signs in any part of the Town of Gilbert, Arizona without a permit.[14] The ordinance included exemptions from the permit requirement for 23 different categories of

---

[10] *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972). Because Auspro's speech here is unquestionably noncommercial, this case, like *Reed*, does not implicate commercial-speech considerations. Although laws that restrict only commercial speech are content based, such restrictions need only withstand intermediate scrutiny. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980).

[11] *Reed*, 135 S. Ct. at 2226 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118, (1991)).

[12] *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).

[13] *See Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989).

[14] *See Reed*, 135 S. Ct. at 2224.

5

signs and, within those exemptions, imposed varying restrictions depending on the category.[15] For example, "ideological signs" were freely allowed with no restrictions, while "political signs" could be displayed without a permit, but only within the 60 days preceding an election and the 15 days following an election.[16]

The *Reed* plaintiffs—a small church and its pastor—challenged the constitutionality of the ordinance after the Town repeatedly cited the church for failure to comply with the sign ordinance's exemption for "temporary directional signs," generally defined as temporary signs intended to direct passerby to a "qualifying event" of a non-profit organization.[17] The church signs, which were posted around town each Saturday to announce the time and location of the next day's service and then removed by Sunday afternoon, violated the ordinance's requirement that temporary directional signs be displayed for no more than twelve hours before the "qualifying event" and for no more than one hour afterward.[18] The Supreme Court, explaining that a regulation of speech is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed," held that the sign code was content based on its face.[19] Specifically, the Court noted that the ordinance defined "temporary directional signs" on the basis of the event being

---

[15] *Id.* at 2224–25.

[16] *Id.* "Ideological signs" are defined as "sign[s] communicating a message or ideas for noncommercial purposes"; and "political signs" as "temporary sign[s] designed to influence the outcome of an election called by a public body." *Id.*

[17] *Id.* at 2225. "Temporary directional signs relating to a qualifying event" are defined as "signs directing the public to a meeting of a nonprofit group." *Id.*

[18] *Id.*

[19] *Id.* at 2227.

advertised and "political signs" on the basis of whether the sign's message "is designed to influence the outcome of an election."[20] Ultimately, after deciding that the ordinance was a content-based regulation subject to strict scrutiny, the Supreme Court determined the Town could not meet its strict-scrutiny burden and struck down the sign ordinance.[21]

First Amendment jurisprudence has long analyzed "content-based" regulation of speech under strict scrutiny. *Reed*'s significance in this area is its clarification of what constitutes a content-based restriction on speech. Before *Reed*, many courts—including the Ninth Circuit in the decision *Reed* reversed and the Texas Supreme Court in its 2003 *Barber* decision upholding the Texas Act—relied on various arguments to deem as content neutral, and thus subject to only intermediate scrutiny, statutes that, on their face, differentiated between categories of speech based on topic or ideas expressed—i.e., were facially content based.[22] Stated generally, these arguments were based on considerations such as whether the regulations in question had been adopted or motivated by "disagreement with the message conveyed" and whether there were justifications for the regulation that were "unrelated to the content of the sign."[23] *Reed* emphatically rejected these

---

[20] *Id.*

[21] *Id.* at 2233; *see Lamar Cent. Outdoor, LLC v. City of Los Angeles*, 245 Cal. App. 4th 610, 621 (Cal. App. 2016) ("In *Reed*, the high court invalidated a town's sign ordinance . . . ."); Urja Mittal, *The "Supreme Board of Sign Review": Reed and Its Aftermath*, 125 Yale L.J. Forum 359, 359 (2016) ("In *Reed v. Town of Gilbert*, the Court applied strict scrutiny and struck down an Arizona sign ordinance as a content-based regulation of speech."); *Free Speech Doctrine After Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1984 (2016) (explaining *Reed* "invalidated" sign code).

[22] *See Reed v. Town of Gilbert*, 707 F.2d 1057, 1071–72 (9th Cir. 2013), *rev'd*, 135 S. Ct. 2218; *Barber*, 111 S.W.3d at 94.

[23] *See Reed*, 135 S. Ct. at 2226–29 (discussing underlying decision and amicius briefs); *Barber*, 111 S.W.3d at 94; *see also* Brian J. Connolly, *Environmental Aesthetics & Free Speech:*

arguments, asserting that this type of analysis "skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face."[24]  If the law is content-based on its face, *Reed* explained, that is the end of the inquiry:  "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."[25]

In sum, as the Supreme Court explained in *Reed*, a law can be content based in either of two ways:  (1) by distinguishing speech by the topic discussed; and (2) where the government's purpose or justification for enacting the law depends on the underlying "idea or message expressed"—i.e., the law is facially content neutral, but the motives in enacting it were content based.[26]  "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."[27]  As noted, this framework marks a significant departure from the content-neutrality analysis used by other courts, including the Texas Supreme Court, that would uphold facially content-based restrictions as long as those restrictions could be justified on content-neutral grounds and as long as the regulations were not adopted based on disagreement with the message.

---

*Toward A Consistent Content Neutrality Standard for Outdoor Sign Regulation*, 2 Mich. J. Envtl. & Admin. L. 185, 197 (2012) (describing the split between federal circuit courts in determining content neutrality).

[24] *Reed*, 135 S. Ct. at 2228.

[25] *Id.* (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

[26] *Id.*

[27] *Id.*

Having determined that the Town's sign ordinance was content based, the *Reed* opinion turned next to analyzing whether the Town could meet its strict-scrutiny burden of showing that the ordinance furthers a compelling interest and is narrowly tailored to achieve that interest.[28] The Town offered only two governmental interests in support of the distinctions the sign code draws: preserving the Town's aesthetic appeal and traffic safety. The Supreme Court, willing to assume for argument's sake that these asserted interests were compelling governmental interests, nevertheless concluded that both "distinctions fail as hopelessly underinclusive"[29]—i.e., they were too limited in their regulatory reach to address the interest at issue.[30] As for the aesthetic interest specifically, the Court noted that the Town could not "claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time it allowed unlimited numbers of other types of signs that create the same [aesthetic] problem."[31] The Supreme Court concluded that the safety interest was likewise underinclusive, noting that it "offered no reason to believe that directional signs pose a greater threat to safety than do ideological signs or political signs."[32] In light

---

[28] *See id.* at 2231 (noting and describing burden (citing *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011)).

[29] *Id.* at 2231.

[30] *See, e.g., Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it.").

[31] *Id.*

[32] *Id.* at 2232.

of its underinclusiveness, the Supreme Court held that the Town's sign ordinance failed strict scrutiny.[33]

Reed next addressed concerns that its holding would "prevent governments from enacting effective sign laws," noting that "not 'all distinctions' are subject to strict scrutiny, only *content-based* ones are. Laws that are *content neutral* are instead subject to lesser scrutiny."[34] As examples, the Court pointed to restrictions in the Town's sign code regarding size, building materials, lighting, moving parts, and portability.[35] The Court further pointed to lower-court decisions that have "long held that similar content-based sign laws receive strict scrutiny" and noted "there is no evidence that the towns in their jurisdictions have suffered catastrophic effects."[36]

Three of the justices filed separate opinions in *Reed*, addressing implications of the majority opinion.[37] Justice Alito proposed several regulations that he concluded would not be considered content based, such as distinctions between on-premises and off-premises signs and time

---

[33] *See id.*

[34] *Reed*, 135 S. Ct. at 2228 (citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295 (1984)).

[35] *Id.*

[36] *Id.* (citing *Solantic, LLC v. Neptune Beach*, 410 F.3d 1250, 1264–69 (11th Cir. 2005) (sign categories similar to the town of Gilbert's were content based and subject to strict scrutiny); *Matthews v. Town of Needham*, 764 F.2d 58, 59–60 (1st Cir. 1985) (law banning political signs but not commercial signs was content based and subject to strict scrutiny)).

[37] Justice Alito filed a concurring opinion in which Justices Kennedy and Sotomayor joined. Justice Breyer filed an opinion concurring in the judgment. Justice Kagan filed an opinion concurring in the judgment in which Justices Ginsburg and Breyer joined.

restrictions on signs for one-time events.[38]  He also noted that, in addition to regulating signs put up

by private actors, "government entities may erect their own signs consistent with the principles that

allow governmental speech."[39]  Justice Kagan, taking a different view in an opinion concurring in

the judgment only, emphasized that, "of course," restrictions on one-time event signs would be

facially content-based in light of the majority's decision because they would "single out specific

subject matter for differential treatment."[40]  Any sign ordinance that restricts some categories of

speech while exempting others, Justice Kagan cautioned, is in "jeopardy" following the Court's

decision and would likely be struck down.[41]  Indeed, a variety of sign codes previously considered

constitutional have been held to be unconstitutional content-based restrictions on speech based

on *Reed*, including Justice Alito's example of a permissible ordinance distinguishing between on-

premise and off-premise signs,[42] as well as an ordinance setting time limits on election signs.[43]

---

[38]  *Id.* at 2233 (Alito, J., concurring).

[39]  *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–69 (2009) (holding that city's placement of monument in park was form of government speech, which is not subject to scrutiny under Free Speech Clause)).

[40]  *Id.* at 2237 (Kagan, J., concurring); *see id.* at 2231 (explaining why event-based restrictions are content based).

[41]  *Id*. at 2236 (Kagan, J., concurring).

[42]  *See Thomas v. Schroer*, 127 F. Supp. 3d 864 (W.D. Tenn. 2015) (rejecting Alito's concurrence and holding that on-premise/off-premise distinction was content based and unlikely to survive strict scrutiny).

[43]  *See Marin v. Town of Se*, 136 F. Supp. 3d 548 (S.D.N.Y. 2015) (striking down sign ban based on existence of exemptions, including election-sign exemption, that differentiated based on content).

Relatedly, *Reed* has thus far been cited in cases striking down an anti-panhandling ordinance,[44] an anti-robocall statute,[45] and a law banning "ballot selfies."[46]

### *Reed* and the Texas Highway Beautification Act

Born from a mid-1960s initiative to clean up the nation's roads, the federal Highway Beautification Act of 1965 requires states to regulate "outdoor advertising" "in areas adjacent to the Interstate System" or risk losing ten percent of their federal highway funding.[47] To comply, states must exert "effective control" over outdoor advertising located inside an imaginary corridor around the highway system that extends 660 feet beyond each side of the "the main traveled way."[48] "Effective control" means that the state must limit the signs and displays within the corridor to "directional and official signs and notices"; "signs . . . advertising the sale or lease of property upon which they are located"; "signs . . . advertising activities conducted on the property on which they are located"; "signs lawfully in existence on October 22, 1965"; and "signs . . . advertising the

---

[44] *See Norton v. City of Springfield*, 806 F.3d 411, 411 (7th Cir. 2015) (noting that *Reed* "abolishe[d] any distinction between content regulation and subject-matter regulation" and made it clear that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter").

[45] *See Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015).

[46] *See Rideout v. Gardner*, 123 F. Supp. 3d 218, 221, 236 (D.N.H. 2015) (law making it "unlawful for voters to take and disclose digital or photographic copies of their completed ballots").

[47] *See* Highway Beautification Act of 1965, Pub. L. No. 89-285, 79 Stat. 1028 (codified as amended at 23 U.S.C. § 131).

[48] *See* 23 U.S.C. § 131(b).

distribution by nonprofit organizations of free coffee."[49] The federal act generally exempts areas that the states have zoned as industrial and commercial.[50]

The Texas Legislature passed the Texas Highway Beautification Act in 1972 to comply with the federal act's mandate that it do so or risk losing highway funds,[51] but included in it other highway-beautification provisions unrelated to the federal mandate, including laws authorizing state-controlled right-of-way information signs, landscaping and scenic enhancement, and junkyard control.[52] The Act's provisions regulating outdoor advertising essentially mirror the federal act, banning all signs located (1) within 660 feet of a right-of-way if the advertising is visible from the interstate, and (2) beyond 660 feet of a right-of-way if the advertising is visible from the highway and erected for the purpose of having its message seen from the highway.[53] The Act then sets forth a number of exemptions to the ban, including exemptions for signs located in commercial and industrial areas;[54] signs advertising as for sale or for lease the property on which the sign is located; signs advertising natural wonders or historic attractions; signs advertising activities that will

---

[49] *Id.*

[50] *See id.* § 131(d) (sign "may be erected and maintained . . . within areas adjacent to the Interstate . . . which are zoned industrial or commercial under authority of State law, or in unzoned commercial or industrial areas as may be determined by agreement between the several States and the Secretary."

[51] *See* Highway Beautification Act, 62d Leg., 2d C.S., ch. 1, § 1, 1972 Tex. Gen. Laws 15 (current version at Tex. Transp. Code §§ 391.007–.255 (Subchapters A through I)).

[52] *See id.* at §§ 2–12, 1972 Tex. Gen. Laws at 15–20 (current version at Tex. Transp. Code §§ 391.091–.213 (Subchapters D through H)).

[53] *See* Tex. Transp. Code § 391.031(a)(1)–(2).

[54] *See id.* § 391.031(b)(4).

13

take place on the property where the sign is located; signs that have as their purpose the protection of life and property;[55] and, specifically implicated here, signs on private property that "relat[e] solely to a public election."[56]

Section 391.032 of the Act gives the Transportation Commission the authority to regulate outdoor advertising in the commercial and industrial areas that are exempted from the Act's ban,[57] which the Commission has done in Title 43 of the Texas Administrative Code.[58] Those rules, stated generally, require that all signs located within the same imaginary corridor as that in the Act have a Department-issued permit or be subject to a fine and removal, unless the sign qualifies under one of several exemptions.[59] The rules' exemptions include those set forth in the Act—e.g., election signs and signs with the purpose of protecting life or property—as well as those for public-service signs, signs of nonprofits or other charitable organizations, neighborhood subdivision or homeowners-association signs, and signs showing the names of ranches.[60] Here, because Auspro's

---

[55] *Id.* § 391.031(b)(1)–(3), (5).

[56] *See id.* § 391.005 (requiring, among other things, that the sign relate to a public election, be located on private property and be erected no earlier than 90 days before an election and removed within 10 days after the election); *see also* 43 Tex. Admin. Code § 21.146(9) (2011) (Tex. Dep't Transp., Exempt Signs), *amended by* 39 Tex. Reg. 7954 (current version at 43 Tex. Admin. Code § 21.146(a)(10)).

[57] *See id.* § 391.032(a).

[58] *See* 43 Tex. Admin. Code §§ 21.141–.204 (Subchapter I, Div. 1, Signs).

[59] *See id.* §§ 21.143 (Tex. Dep't Transp., Permit Required), 21.198 (Order of Removal), 21.204 (Administrative Penalties).

[60] *See id.* § 21.146 (Exempt Signs).

property was located in a commercial-zoned area, its sign was required to have a permit or qualify for a permit exception, which it did not.

Under *Reed*'s standard for content neutrality—which simply asks whether the law applies to particular speech because of the topic discussed or the idea or message expressed—the Texas Act's outdoor-advertising regulations are clearly content based. The Texas Supreme Court acknowledged as much when it considered these same provisions of the Act in *Barber*: "The Act . . . does make certain distinctions based on subject matter."[61] Specifically, as described above, most of the Act's exemptions depend entirely on the subject matter of the sign's message:

- "erected solely for and relating to a public election";[62]

- "advertising . . . a natural wonder or scenic or historic attraction";[63]

- "advertising . . . the sale or lease of the property on which it is located";[64] and

- "advertising . . . activities conducted on the property on which it is located."[65]

And at least one exemption in the Act is based on the function or purpose of the regulated speech: "[O]utdoor advertising that has as its purpose the protection of life and property."[66]

---

[61] 111 S.W.3d at 98 (referring to Tex. Transp. Code §§ 391.005, .031(b)).

[62] Tex. Transp. Code § 391.005.

[63] *Id.* § 391.031(b)(1).

[64] *Id.* § 391.031(b)(2).

[65] *Id.* § 391.031(b)(3).

[66] *Id.* § 391.031(b)(5).

15

Because exemptions to the Department's permitting rules—several of which are identical to Act exemptions—are likewise based on the speech's subject matter, function or purpose, and the speaker, they too are content-based regulations of speech under *Reed*'s framework.

Like the Town of Gilbert's sign ordinance, the Texas Act and the related Department rules restrict speech in different ways based on the communicative content of the sign.[67] For example, a sign advertising a presidential candidate's fundraising event at the site where the sign is displayed would be allowed at any time under the Texas Act,[68] while a sign that merely expresses the view that one should vote for that same presidential candidate would be banned during all but the small window around an election.[69] Likewise, and more to the point here, Auspro's election sign for Ron Paul is treated differently under the Department rules (promulgated under the Act) than are signs conveying other messages and ideas, including, for example, a sign by a nonprofit organization advertising an event by that organization.[70] Under *Reed*'s framework, the Texas Act's outdoor-advertising regulations and associated Department rules are, on their face, content-based regulations of speech.[71]

The Department asserts that *Reed* does not inform our decision here because the Texas Act actually protects Auspro's speech. The election-sign exemption does not prohibit

[67] *See Reed*, 135 S. Ct. at 2227.

[68] *See* Tex. Transp. Code § 391.031(b)(3) (generally exempting signs advertising "activities conducted on the property on which [the sign] is located").

[69] *See id.* § 391.005 (allowing election signs only 100 days around election).

[70] *See* 43 Tex. Admin. Code § 21.146(6), (10).

[71] *See Reed*, 135 S. Ct. at 2227.

16

elections signs in violation of the First Amendment, the Department argues, but "allows certain election speech that would otherwise be barred by the Act's general, content-neutral prohibition of signs visible from highways." "Even if the exemption draws a content-based line," the Department continues, "that line would, if anything favor the very type of election speech that Auspro advocates." This argument misses the point of *Reed*.

First, there is little, if any, difference between the election-sign exemption examined in *Reed* and the one at issue here.[72] Both exempt election-related signs from a general ban on signs within a certain number of days surrounding an election.[73] More importantly, both exemptions distinguish speech based on the subject matter of that speech. Signs relating to elections are restricted as to date and size in ways that other non-election signs are not. Characterizing such an exemption as "favorable" to protected speech does not change the fact that it is a distinction based on content under *Reed*. If anything, it exposes the exemption as "a paradigmatic example of content-based discrimination."[74] The Department's insistence on looking beyond the face of the Act despite its awareness that the election-sign "exemption draws a content-based line" ignores *Reed*'s plainly stated holding that, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."[75] The Texas Act, as both the Department and

---

[72] *See id.* at 2225.

[73] *See* Tex. Transp. Code § 391.005; *Reed*, 135 S. Ct. at 2225.

[74] *Reed*, 135 S. Ct. at 2230 (explaining ordinance's more favorable treatment of some signs based on content).

[75] *Id.* at 2237.

17

the Texas Supreme Court have acknowledged, on its face draws distinctions based on the message a speaker conveys—i.e., is content based on its face under the *Reed* analysis.

In what it considers a related argument regarding *Reed*'s import here, or rather lack of import, the Department next suggests that the sign code in *Reed* and the Texas Act are inherently different because, as the Texas Supreme Court noted in *Barber*, the Texas Act "allows all onsite commercial speech and all onsite noncommercial speech" throughout the year.[76] This is important, the Department urges, because if Auspro had simply made "its election speech pertain[] to activities on its premises, its sign would have complied with the Texas Act." While this may be true, the Department's argument again overlooks the effect of *Reed*'s holding. The point of *Reed* is not whether the regulation provides alternative avenues of speech, but whether it "applies to particular speech because of the topic discussed or the idea or message expressed."[77] Moreover, the Department's suggestion that Auspro could have complied with the Act by simply changing its sign to advertise a Ron Paul-related event on its premises—an example similar to that used in *Reed*[78]—actually emphasizes the Act's disparate treatment of content.

Finally, before addressing the Department's remaining point, we note that we always faithfully adhere to our obligation, as an intermediate appellate court, to defer to the Texas Supreme

---

[76] *Barber*, 111 S.W.3d at 99 (emphasis omitted); *see* Tex. Transp. Code § 391.031(b)(3) (exempting from ban signs advertising activities conducted on property on which it is located).

[77] *Reed*, 135 S. Ct. at 2227.

[78] *See id.*, 135 S. Ct. at 2227 ("If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government.").

Court's decisions, and we are mindful that its decision to uphold the Act in *Barber* would likely be dispositive of Auspro's appeal here.[79] In light of *Reed*'s changes to First Amendment jurisprudence, however, we respectfully disagree with the Department's assertion that we remain bound by *Barber*'s holding that the Texas's Highway Beautification Act "is content neutral and constitutes a valid time, place, and manner restriction."[80] As we explain above, *Barber* acknowledged that the Texas Highway Beautification Act:

> does make certain distinctions based on subject matter. For example, the Act exempts from regulation directional signs, signs pertaining to natural wonders or scenic or historic attractions, signs for the sale of property on which they are located, signs designed to protect life and property, and signs providing information about the location of utility lines. The Act also exempts temporary signs relating to public elections and signs relating to activities conducted on the property where the signs are located.[81]

In light of *Reed*'s unequivocal holding, these distinctions render the Act's sign ban content based and presumptively invalid unless the government can meet its strict-scrutiny burden.[82] We would note further that the *Barber* majority, along with many other courts, construed pre-*Reed* precedent as allowing "content-based regulations [to be treated] as content neutral if the regulations are

---

[79] *See, e.g.*, *Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court, or the highest court of the State having jurisdiction of the particular case, the decision is accepted as binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties.").

[80] *Barber*, 111 S.W.3d at 90.

[81] *Id.* at 93.

[82] *See Reed*, 135 S. Ct. at 2226.

19

motivated by a permissible content-neutral purpose,"[83] as long as "the Act does not endorse any particular viewpoint."[84]  In doing so, *Barber* reasoned that "the Act does not endorse any particular viewpoint"; "the Texas Legislature did not adopt the Texas Highway Beautification Act because it disagreed with any messages that might otherwise be conveyed"; and ultimately concluded that "the Act is . . . content neutral because it is '*justified* without reference to the content of the regulated speech.'"[85] With regard to the election-sign exemption, the *Barber* majority explained that, although "arguably content based," it could be "deemed neutral" because it "serves purposes unrelated to the content of expression."[86]  As noted, *Reed* has explicitly rejected these same arguments and analyses.[87]  In doing so, *Reed* has, at a minimum, eliminated the essential underpinnings of the content-neutrality analysis on which *Barber*'s holding relied.  As such, we must adhere to our obligation to follow the United States Supreme Court on this First Amendment issue.[88]

---

[83]  *Barber*, 111 S.W.3d at 93 (relying on *Ward*, 491 U.S. at 784 and *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986)).

[84]  *Id.* at 98.

[85]  *Id.* at 100 (quoting *City of Renton*, 475 U.S. at 48).

[86]  *Id*.

[87]  *See Reed*, 135 S. Ct. at 2228.

[88]  *See Barstow v. State*, 742 S.W.2d 495, 501 n.2 (Tex. App.—Austin 1987, writ denied) ("On questions of federal law . . . all courts in every state owe obedience to the Supreme Court of the United States."); *see also Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (Texas courts "are *obligated* to follow only higher Texas courts and the United States Supreme Court." (citing *Barstow*, 742 S.W.2d. at 501 n.2)).

We hold that, under *Reed*'s framework, the Texas Highway Beautification Act's outdoor-advertising regulations and related Department rules are content-based regulations of speech subject to strict scrutiny.

**Strict scrutiny**

Under a strict-scrutiny analysis, which has been described as "'strict' in theory but usually 'fatal' in fact,'"[89] the government has the burden of proving that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.[90] Here, the Department has to demonstrate that the Act's differentiation between types of signs furthers a compelling governmental interest and it is narrowly tailored to that end.[91] The Department acknowledges that it cannot do this, and we cannot disagree. For example, even assuming, as did the Supreme Court in *Reed*,[92] that aesthetic appeal and traffic safety are compelling governmental interests, the Act's provisions are underinclusive: election signs outside the 100-day window around an election would pose no greater threat to safety and would not categorically be any uglier than the signs that are treated differently

---

[89] *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1987) (quoting Gerald Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972)); *see Reed*, 135 S. Ct. at 2236 (Kagan, J., concurring) ("After all, it is the 'rare case[] in which a speech restriction withstands strict scrutiny." (quoting *Williams–Yulee v. Florida Bar*, 135 S. Ct. 1656, 1666, (2015)); 2 Chester James Antieau & William J. Rich, *Modern Constitutional Law* § 25.02, at 8 (2d ed. 1997) (noting strict scrutiny "create[s] virtually insurmountable hurdles for the government seeking to defend its classifications").

[90] *Reed*, 135 S. Ct. at 2231 (citing *Bennett*, 131 S. Ct. at 2817 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010))).

[91] *See id.*

[92] *See id.*

21

under the Act.[93]  And with the possible exception of the exemption for signs regarding the protection

of life and property,[94] the Act's remaining content-based exemptions are similarly underinclusive.[95]

For the same reasons, the related Department rules likewise cannot meet such an exacting standard.

Accordingly, the Act's sign regulations and related Department permitting rules fail strict scrutiny.[96]

**Remedy**

Having determined that the government restrictions on speech at issue here

fail strict scrutiny, we must now determine the appropriate remedy.  The Department maintains that

rather than grant Auspro its requested relief of declaring the entire Texas Highway Beautification

Act unconstitutional, we are limited to severing the election-sign exemption from the Act.  This is

so, the Department contends, because Auspro's opening brief to this Court targeted only the election-

sign exemption, which the Department asserts means that Auspro has waived any broader challenge

to the Act and, thus, the remedy to declare the entire Act unconstitutional.[97]  The Department

---

[93]  *See id.*

[94]   *See* Tex. Transp. Code § 391.031(b)(5).  Nevertheless, virtually every court and legal commentator that has discussed this topic, including the Supreme Court, has insisted that strict-scrutiny review is effectively fatal.  *See supra* n. ___.

[95]  *See* Tex. Transp. Code § 391.031(b)(1)–(3); *Reed*, 135 S. Ct. at 2231.

[96]  *See Reed*, 135 S. Ct. at 2232 (holding that Town's sign code failed strict scrutiny because exceptions were underinclusive).

[97]   *See* Tex. R. App. P. 38.1(i), (j) (issues not raised in opening brief are waived); *Salazar v. Phillips & Luckey Co.*, No. 03-11-00441-CV, 2013 WL 4516021, at *4 (Tex. App.—Austin Aug. 21, 2013, no pet.) (mem. op.) ("'[A]n appellate court has no discretion to consider an issue not raised in an appellant's brief.'" (quoting *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 930 (Tex. App.—Houston [14th Dist.] 2008, no pet.))).

relatedly invokes Texas's broad severability statute, urging that because we can remedy the Act's

unconstitutionality by simply severing the election-sign exemption, we must do so.[98] We disagree

that Auspro's opening brief is so limited,[99] but we do agree that Texas's severability doctrine dictates

that we preserve portions of the Texas Act.

The applicable severability provision of the Code Construction Act provides:

> if any provision of the statute or its application to any person or circumstance is held
> invalid, the invalidity does not affect other provisions or applications of the statute
> that can be given effect without the invalid provision or application, and to this end
> the provisions of the statute are severable.[100]

This severability provision is similar to the doctrine previously adopted by the Texas Supreme Court:

> "When . . . part of a statute is unconstitutional, that fact does not authorize the courts
> to declare the remainder void also, unless all the provisions are connected in
> subject-matter, dependent on each other, operating together for the same purpose, or
> otherwise so connected together in meaning that it cannot be presumed the legislature
> would have passed the one without the other. . . . If, when the unconstitutional
> portion is stricken out, that which remains is complete in itself, and capable of being

---

[98] *See* Tex. Gov't Code § 311.032.

[99] Auspro's initial brief to this Court asserts, "The Texas Highway Beautification Act . . . turn[s] the[] fundamental constitutional principles [that regulation based on the content of speech is subject to strict scrutiny] on their head by banning signs related to elections from appearing on private property along the State's highways and interstates for three fourths of the year, while signs relating to other topics have no similar restriction." Although explicitly singling out the election-sign exemption, the gravamen of this assertion is that the Act violates the constitutional prohibition against content-based regulations of speech because, on its face, it "draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. This is a facial challenge to the Act.

[100] Tex. Gov't Code § 311.032(c) (applicable to statutes without a severability provision).

23

executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.[101]

In short, the purpose of severability is to sever a statute's problematic portions while leaving the remainder intact whenever possible—i.e., to "limit the solution to the problem"[102]—but whatever we do, our primary focus must be on the intent of the legislature.[103]

Dependent as it is on *Reed* and Auspro's underlying claim, our decision here is necessarily limited to government regulation of noncommercial speech, specifically Texas's regulation of outdoor advertising in the Texas Highway Beautification Act.[104] But as briefly noted above, the Texas Act includes several provisions that, while related to highway beautification, do not constitute government regulation of speech. For example, the Act includes the Legislature's

---

[101] *Western Union Tele. Co. v. State*, 62 Tex. 630, 634 (1884); *see Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (citing *Western Union*, 62 Tex. at 634, for severability test).

[102] *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).

[103] *Rose*, 801 S.W.2d at 850 (Phillips, C.J., dissenting); *see Geeslin v. State Farm Lloyds*, 255 S.W.3d 786, 797 (Tex. App.—Austin 2008, no pet.) (citing *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) ("Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.")); *see also Ayotte*, 546 U.S. at 329 ("We prefer . . . to sever its problematic portions while leaving the remainder intact.").

[104] *See, e.g.*, *Free Speech Coal., Inc. v. Attorney Gen. U.S.*, 825 F.3d 149, 176 n.7 (3rd Cir. 2016) (noting that *Reed* did not abolish distinction between commercial and noncommercial speech); *Geft Outdoor LLC v. Consolidated City of Indianapolis*, 2016 WL 2941329, at \*10 (S.D. Ind. May 10, 2016) (determining that *Reed*'s holding is limited to noncommercial speech (citing *Contest Promotions, LLC v. City & Cty. of S.F.*, 2015 WL 4571564, at \*4 (N.D. Cal. July 28, 2015) ("*Reed* does not concern commercial speech, . . . .")).

program for state controlled right-of-way information logo signs;[105] regulations controlling junkyards

and automobile graveyards along the State's highways;[106] and the Transportation Commission's

legislative authority to acquire property along the State's highways "to restore, preserve, or enhance

scenic beauty" or to provide public rest areas.[107]  Because these provisions in the Texas Act are not

government regulations of speech, neither *Reed* nor our decision here affect their validity.[108]  Also,

the provisions in Subchapter I are not affected by our decision here because they authorize the

State to regulate commercial speech along certain specified highways, specifically off-premise signs

displaying messages regarding "goods, services, or merchandise."[109]  Regarding our severability

analysis, it is worth noting that these provisions of the Act, although related to highway

---

[105] *See* Tex. Transp. Code §§ 391.091–.099 (Subchapter D, Specific Information Logo Signs) (creating programs for signs in State's right-of-way that contain logos of participating businesses); *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2249–50 (2015) (holding Texas's speciality license plates are government speech, thus not subject to scrutiny under Free Speech Clause (relying on *Pleasant Grove*, 555 U.S. at 471)).

[106] *See* Tex. Transp. Code §§ 391.121–.127 (Subchapter E, Regulation of Junkyards and Automobile Graveyards) (prohibiting junkyards/automobile graveyards within 1,000 feet of highway unless junkyard is properly screened from view or in industrial area).

[107] *See id.* §§ 391.151–.152 (Subchapter F, Acquisition for Scenic Enhancement or Public Accommodation), 391.181–.184 (Subchapter G, Acquisitions by Commission).

[108] Although Subsection H authorizes the State to regulate outdoor advertising on State Highway 288, it does not include any content-based provisions.  *See id.* §§ 391.211–.213.

[109] *Id.* § 391.251(2)–.252; *see Central Hudson*, 447 U.S. at 563–64 (describing commercial speech as "expression related solely to the economic interests of the speaker and its audience" and holding that content-based restrictions on commercial speech need only withstand intermediate scrutiny); *see also Pruett v. Harris Cty. Bail Bond Bd.*, 249 S.W.3d 447, 456 (Tex. 2008) ("Commercial speech is generally afforded less constitutional protection than other forms of constitutionally guaranteed expression." (citing *Central Hudson*, 447 U.S. at 563)).

25

beautification, were not mandated by the federal Highway Beautification Act.[110]  Further, because

these provisions are complete in themselves—i.e., they would not be affected by the invalidity of the

sign-ban regulations of Subchapters B and C—and are capable of being executed as the Legislature

intended in the absence of the Act's outdoor-advertising regulations, Texas's severability doctrine

mandates that they be preserved.[111]

Turning to the regulations of speech that are at issue here, those can be found

in Subchapters B and C of the Act.[112]  Within those subchapters, there are several individual

sections that, under *Reed* and our analysis here, are unconstitutional content-based restrictions on

noncommercial speech.[113]  As such, severing only the election-sign exemption, as the Department

asks us to limit our remedy, would not cure the constitutional infirmities caused by the remaining

content-based exemptions.  In fact, severing only the election-sign exemption would not even

remedy Auspro's harm because the Act would still ban Auspro's election campaign sign—all year,

---

[110]  *See* 23 U.S.C. § 131(a)–(t).

[111]  *See Western Union*, 62 Tex. at 634; *see also* Tex. Gov't Code § 311.032 (courts should sever unconstitutional aspects and save balance of law if "other provisions or applications of the statute . . . can be given effect without the invalid provision or application").

[112]  *See* Tex. Transp. Code §§ 391.031–.037 (Subchapter B, "Regulation of Outdoor Advertising Generally"), 391.061–.070 (Subchapter C, "License and Permit for Outdoor Advertising"), 391.211–.213.

[113]  The Act's definition of "outdoor advertising" is so broadly worded that it plainly encompasses both commercial and noncommercial content:  "'Outdoor advertising' means an outdoor sign, display, light, device, figure, painting, drawing, message, plaque, poster, billboard, or other thing designed, intended, or used to advertise or inform if any part of the advertising or information content is visible from the maintraveled way of the interstate or primary system." Tex. Transp. Code § 391.001(10); *see Central Hudson*, 447 U.S. at 563 (describing commercial speech as "expression related solely to the economic interests of the speak and its audience").

every year—while allowing other categories of signs at all times, all based on their content. In other words, even with the election-sign exemption invalidated, the Act would still treat speech differently based on the content of that speech.

To resolve the Act's constitutional problems, all of the content-based provisions must be severed—including at least sections 391.031(b), 391.037,[114] 391.061(c), and 391.070.[115] This would leave standing, with respect to the substantive provisions of the Act's ban on outdoor advertising, only section 391.031(a)'s prohibition against signs within the imaginary federal corridor and two exemptions: one for signs erected in industrial or commercial areas (subject to state permitting rules); and the other for signs erected before October 22, 1965.[116]

Would this leave standing a law—i.e., the Legislature's ban on outdoor advertising—that is "complete in itself"?[117] Perhaps. But what is not so easily answered in the affirmative is the second prong of the severability question: Is the remaining law "capable of

---

[114] Section 391.037 involves advertising by certain county agricultural fairs. *See id.* § 391.037. *Reed* noted that speech restrictions based on the identity of the speaker are often content based and subject to strict scrutiny. *See Reed*, 135 S. Ct. at 2230 (citing *Citizens United*, 558 U.S. at 340; *Turner Broadcasting Sys., Inc. v. Federal Commc'ns Comm'n*, 512 U.S. 622, 658 (1994)).

[115] Section 391.070 creates an exception for certain nonprofit organizations. *See* Tex. Transp. Code § 391.070; *supra* n. __.

[116] *See* Tex. Transp. Code § 391.031(a).

[117] *Western Union*, 62 Tex. at 634; *see* Tex. Gov't Code § 311.032 (courts should sever unconstitutional aspects and save balance of law if "other provisions or applications of the statute . . . can be given effect without the invalid provision or application").

being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected"?[118]

The Department suggests that because the original version of the Texas Act did not include the election-sign exemption, severing that exemption would do no harm to the Legislature's intent in enacting the ban on outdoor advertising. But the 1972 Texas Act included the sign-ban exemptions now codified in section 391.031.[119] And certain of these original exemptions seem to be directed at protecting traditional rights enjoyed by property owners—e.g., allowing an owner to advertise the sale or lease of the property; to promote or advertise activities taking place on the property; and to warn about issues affecting life and property. To that extent, these exceptions express the Legislature's intent to protect those rights, and a blanket ban on all outdoor advertising would potentially alter that intent. These arguments also completely ignore the possibility that a complete ban on all signs, while likely content neutral, could raise other free-speech and property-rights concerns.[120] At a minimum, though, we cannot know whether the Legislature would have enacted a complete ban on outdoor advertising. Moreover, given that the federal Highway Beautification Act—the primary impetus for the Texas Act and, in fact, the law on which the Texas Act "is conditioned"[121]—seems to share the same constitutional flaws as does the Texas Act under

---

[118] *Western Union*, 62 Tex. at 634.

[119] *See* Highway Beautification Act, 62d Leg., 2d C.S., ch. 1, § 4, 1972 Tex. Gen. Laws 15, 16 (current version codified at Tex. Transp. Code § 391.031).

[120] *See, e.g.*, *Gilleo*, 512 U.S. at 55 (noting dangers to freedom of speech posed by content-neutral prohibition of all signs).

[121] *See* Tex. Transp. Code § 391.002(a) ("This Chapter is conditioned on th[e Highway Beautification Act of 1965].").

28

*Reed*,[122] we cannot say with any certainty what the Texas Legislature will want in terms of a ban on highway signs in the absence of a federal act requiring one. Should the federal act be declared unconstitutional—a possibility suggested by the United States' amicus brief in *Reed*[123]—Congress and other state legislatures would be faced with deciding whether to enact sign restrictions and, if so, how to comply with *Reed*. That is the sole province of the Legislative Branch.

Finally, we think it is worth noting that this Court—in the opinion accompanying the judgment that was later reversed by the Texas Supreme Court in *Barber*—addressed and rejected this same suggestion by the Department that we could remedy any constitutional flaws in the Act by eliminating all exemptions, leaving a total ban on outdoor advertising.[124] Our response was to invoke the Supreme Court's reasoning in *City of Ladue v. Gilleo*:

> "[T]he City might theoretically remove the defects in its ordinance by simply repealing all of the exemptions. If, however, the ordinance is also vulnerable because it prohibits too much speech, that solution would not save it. Moreover, if the prohibitions in Ladue's ordinance are impermissible, resting our decision on its exemptions would afford scant relief for respondent Gilleo. She is primarily concerned not with the scope of the exemptions available in other locations, such as

---

[122] *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Petitioners, *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) (No. 13-502) (urging Supreme Court to consider nuanced application of strict scrutiny to facially content-based restrictions because of likely adverse consequences to certain statutes, including federal highway beautification act, that included content-based provisions).

[123] *Id.* at 11, 26, 33; *see also Reed*, 135 S. Ct. at 2239 (Kagan, J., concurring) (noting that "thousands of towns have such [sign ordinances], many of them 'entirely reasonable'" and expressing concern that *Reed* would require courts "to invalidate [them] one after the other").

[124] *See Barber v. Texas Dep't of Transp.*, 49 S.W.3d 12, 25 (Tex. App.—Austin 2001), *rev'd* 111 S.W.3d at 86.

commercial areas and on church property; she asserts a constitutional right to display an antiwar sign at her own home."[125]

And as we did then, we conclude today, "The same might be said of the Texas Highway Beautification Act."[126]

**On motion for rehearing**

The Department's motion for rehearing asserts that our remedy is unnecessarily broad because it "prohibit[s] state regulations on commercial speech" that were not implicated in *Reed* or in the underlying facts of this case. The Department urges us to leave standing Subchapters B and C and sever only the State's ability to apply those subchapters to noncommercial speech.

While we have acknowledged that *Reed*'s holding seems to affect only restrictions of noncommercial speech,[127] the plain language of the Texas Act defines "outdoor advertising" so broadly that the Act's restrictions on speech apply to both commercial and noncommercial speech.[128] That the Legislature intended to encompass—and thus regulate—both commercial and noncommercial speech under Subchapters B and C is confirmed by comparison to the language of Subchapter I, which clearly and unambiguously limits that subchapter to the regulation of

---

[125] *Barber*, 49 S.W.3d at 25 (quoting *Gilleo*, 512 U.S. at 53).

[126] *Id.*

[127] *See supra* at 5; *see also, e.g.*, *Free Speech Coal., Inc.*, 825 F.3d at 176 n.7 (noting that *Reed* did not abolish distinction between commercial and noncommercial speech); *Geft Outdoor LLC*, 2016 WL 2941329, at *10 (*Reed* limited to noncommercial speech).

[128] *See* Tex. Transp. Code § 391.001(10) (defining "outdoor advertising" as, in part, "other thing designed, intended, or used to advertise or inform").

commercial speech.[129]  Whatever the desirability of rendering a judgment that merely severs the

Act's application to noncommercial speech, such a remedy would essentially rewrite the Act contrary

to its plain language with no indication that the Legislature would have intended such a resulting

regulatory scheme.[130]  Moreover, such a severance would present the risk of substituting one set of

constitutional problems for another.[131]

Finally, we note that our opinion here does not hold that the State lacks the

power to regulate billboards along Texas highways.  Rather, our opinion holds that under *Reed* the

Texas Highway Beautification Act's outdoor-advertising regulations and related Department rules

are, as written, unconstitutional "content-based" regulations (as defined by *Reed*) of noncommercial

speech because they do not pass strict-scrutiny analysis.  The Legislature may see fit to amend the

Act in an attempt to conform to *Reed* or to amend it such that it regulates only commercial speech

---

[129]  *See* Tex. Transp. Code § 391.251(2) (defining "advertising" as "a message seeking to attract the public or to direct the attention of the public to any goods, services, or merchandise"); *Central Hudson*, 447 U.S. at 563 (describing commercial speech as "expression related solely to the economic interests of the speaker and its audience").

[130]  *See Western Union*, 62 Tex. at 634 ("If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand."); *see also Rose*, 801 S.W.2d at 844 (citing *Western Union*, 62 Tex. at 634, for severability test).

[131]  *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 536–39 (1981) (Brennan, J., concurring) (explaining that giving governmental unit discretion to decide whether speech is commercial or noncommercial threatens "noncommercial speech in the guise of regulating commercial speech"); *Metromedia, Inc. v. City of San Diego*, 32 Cal. 3d. 180, 190 (Cal. 1982) (declining to enjoin sign ordinance's application to commercial speech because of the "serious constitutional problems" presented by such a remedy (citing Brennan's concurrence in *Metromedia*, 453 U.S. at 536–39).

within the applicable constitutional bounds. In short, it is for the Legislature, not this Court, to clarify its intent regarding the Texas Highway Beautification Act in the wake of *Reed*.

**Conclusion**

Guided by *Reed*, we are compelled to reverse the district court's judgment and render judgment severing Subchapters B and C[132] from the Texas Highway Beautification Act as unconstitutional content-based restrictions of speech.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Field

Reversed and Rendered on Motion for Rehearing

Filed: December 8, 2016

---

[132] Tex. Transp. Code §§ 391.031–.070.