**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5468-16T1

IN THE MATTER OF THE DENIAL
OF THE OUTDOOR ADVERTISING
APPLICATION NUMBER 75708,
NEW JERSEY TURNPIKE (I-95)
E. ALIGNMENT E/S, MILEPOST
113.8 N.R.D. SECAUCUS TOWN,
HUDSON COUNTY.

_____

Argued November 8, 2018 – Decided June 18, 2019

Before Judges Ostrer and Mayer.

On appeal from the New Jersey Department of Transportation.

D. Mark Leonard argued the cause for appellant Hartz Mountain Industries, Inc. (Horowitz Rubino & Patton, attorneys; D. Mark Leonard, of counsel and on the briefs).

Jennifer R. Jaremback, Deputy Attorney General, argued the cause for respondent Department of Transportation (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Jennifer R. Jaremback, on the brief).

PER CURIAM

Hartz Mountain Industries, Inc. (Hartz) applied for a permit to erect a multi-message digital billboard visible to vehicles travelling south on the New Jersey Turnpike, I-95. Hartz proposed to place the sign on an existing structure that currently displays a sign facing northbound traffic. The New Jersey Department of Transportation (DOT) denied the application because the proposed billboard would be less than 500 feet from an interchange, as defined, contrary to N.J.A.C. 16:41C-8.1(d)(2). On appeal, Hartz claims the regulatory scheme violates its First Amendment rights to free speech. Hartz contends that DOT's regulations governing outdoor advertising are facially unconstitutional because they treat on-premise signs differently from off-premise signs, like Harz's proposed billboard. Hartz also argues that the regulation is unconstitutional as applied, because Hartz's proposed billboard, based on its particular location, poses no threat to aesthetics and traffic safety.

We conclude that Hartz lacks standing to raise its facial challenge. As for its as-applied challenge, we remand for development of a factual record to help determine whether the distance restriction applied to Hartz's proposed billboard promotes traffic safety.

A-5468-16T1

The billboard structure that Hartz identified in its February 2015 permit application lies on the Turnpike's Eastern Spur near milepost 113.8 in Secaucus. Southbound motorists would need to look to their left, across the northbound lanes, to view the proposed billboard, which is located on the northwest corner of a Walmart property. The structure is also located north of Exit 17, which provides access to I-495 and the Lincoln Tunnel to New York City. To accommodate exiting traffic, the three south-bound lanes expand to five lanes, 374 feet south of the proposed billboard. Around 1900 feet from the pavement widening, the two added lanes split off and exit the highway.

DOT denied Hartz's application because the proposed billboard would be closer than 500 feet from the interchange at Exit 17. DOT measures distance from an interchange two ways: (1) from the "point of gore," that is, "the point where the main-traveled way and a ramp or another highway come together,"[1] N.J.A.C. 16:41C-2.1, and (2) from the point of pavement widening. N.J.A.C. 16:41C-8.1(d)(2). An "off-premise sign" may not be located within 500 feet of

---

[1] In other words, the "point of gore" is the point of the angle or vertex, formed by exit lanes separating from the main roadway.

either the point of gore or the point of pavement widening, or any point between those two 500-foot zones.  Ibid.  If there is no pavement widening, a sign shall not be located within 1000 feet of the point of gore.  N.J.A.C. 16:41C-8.1(d)(2)(i).

DOT's regulations implement state and federal statutory standards, as well as a federal-state agreement: the Roadside Sign Control and Outdoor Advertising Act (RSCOAA), N.J.S.A. 27:5-5 to -32; Agreement for Carrying Out National Policy Relative to Control of Outdoor Advertising in Areas Adjacent to the National System of Interstate and Defense Highways and the Federal-Aid Primary System (Agreement) (December 29, 1971); the Federal Highway Beautification Act of 1965 (HBA), 23 U.S.C. § 131; and federal implementing regulations, 23 C.F.R. 750.701 to .713.

The HBA conditions ten percent of a state's Federal-aid highway funds on the state's compliance with federal restrictions on outdoor advertising.  23 U.S.C. § 131(b).  The statute requires "effective control" of signs within 660 feet of the right-of-way of all interstate and primary system highways.  Ibid.  In non-urban areas, the HBA also requires "effective control" beyond that 660-foot

limit, if the sign is visible from the roadway and erected with that visibility in mind. Ibid.[2]

However, the HBA permits signs within 660 feet of the interstate and primary system highways in "zoned . . . or . . . unzoned industrial or commercial areas as may be determined by agreement" between a state and the United States Secretary of Transportation. 23 U.S.C. § 131(d); see also 23 C.F.R. 750.704(a)(4), (5) (permitting such signs); 23 C.F.R. 750.706(a) (providing that a state, "by law or regulation shall, in conformity with its agreement with the Secretary, set criteria for size, lighting and spacing of outdoor advertising signs" in commercial or industrial areas).

---

[2] "Effective control" means that only signs in five categories are permitted: (1) "directional and official signs and notices, [including those] . . . pertaining to natural wonders, scenic and historical attractions, which conform to federal standards on size, number, spacing and other requirements;" (2) advertisements for "the sale or lease of property" upon which the sign is located; (3) so-called "on-premise signs," that is, "signs, displays, and devices . . . advertising activities conducted on the property on which they are located;" (4) certain historic signs that existed on October 22, 1965; and (5) signs by non-profit groups advertising free coffee. 23 U.S.C. § 131(c); see also 23 C.F.R. 750.154 (setting standards for directional signs including that they may not be within 2000 feet of an interchange "measured along the Interstate or freeway from the nearest point of the beginning or ending of pavement widening at the exit from or entrance to the main traveled way"); 23 C.F.R. 750.704(a)(1), (2), (3), (6) (addressing the first four categories in 23 U.S.C. 131(c)); 23 C.F.R. 750.709 (setting standards for permissible "on-property or on-premise advertising").

5

Under its 1971 Agreement with the federal government, New Jersey agreed to "effectively control" off-premise signs in industrial and commercial areas through regulation, or, in the absence of regulations, criteria in the agreement.  Agreement, § III.  The Agreement provided that outside of municipalities with a population over 40,000, signs may not be located within 500 feet of an interchange, intersection at grade, or rest area, as measured "from the beginning or ending of pavement widening at the exit from or entrance to the main-traveled way."  Ibid.

However, the principal sources of New Jersey's restrictions on outdoor advertising are the RSCOAA and the implementing state regulations. The Legislature expressly intended that the RSCOAA and its implementing regulations balance and promote multiple goals, including the travelling public's safety, aesthetics, economic development, and free speech.  N.J.S.A. 27:5-6(a); see also N.J.S.A. 27:5-18(b).  Subject to implementing regulations, the RSCOAA authorized permits for signs in zoned and unzoned commercial and industrial areas, as well as on-premise signs, that is, "[s]igns advertising activities conducted on the property on which they are located."  N.J.S.A. 27:5-11(a).  Permits are not required for signs advertising the sale or rent of the

property on which the sign is located and on-premise signs that are not adjacent to the interstate or primary system highways. N.J.S.A. 27:5-12.

As noted, an "off-premise sign" "shall [not] be located within 500 feet of an interchange, intersection at grade, or safety rest area." N.J.A.C. 16:41C-8.1(d)(2). An off-premise sign is defined as anything that is not an "on-premise sign," which is "a sign that identifies the proper name of the business or place where the sign is located or which identifies an actual bona fide and principal activity, product or service . . . of the property on which the sign is located." N.J.A.C. 16:41C-2.1. An otherwise on-premise sign will be deemed an off-premise sign if it (1) generates "compensation to the property owner or to the sign owner"; or (2) principally advertises a brand or trade name that is only incidental to the premise's principal activity. Ibid.

Notwithstanding N.J.S.A. 27:5-11(a), the regulation dispenses with permits for on-premise signs. N.J.A.C. 16:41C-1.2(c). Also, the regulation imposes no distance requirements on on-premise signs. Thus, a qualified on-premise sign may exist within 500 feet of interchanges, intersections at grade, and safety service areas. DOT charges application fees of up to $200 and annual permit fees of up to $635 for each off-premise billboard. N.J.A.C. 16:41C-7.1, -7.2.

Consistent with 23 C.F.R. 750.154, the New Jersey regulation provides that "directional signs" must not be "within 2000 feet of an interchange or intersection at grade along a limited access highway." N.J.A.C. 16:41C-8.2(f). Although the regulation does not expressly identify how to measure the 2000-foot distance, we infer it is from the point of pavement widening, as in 23 C.F.R. 750.154. A "directional sign" contains "directional information about publicly owned places, natural phenomena, historic, cultural, scientific, educational, and religious sites; or areas of natural scenic beauty or naturally suited for outdoor recreation, deemed, by the Commissioner, to be in the interest of the traveling public." N.J.A.C. 16:41C-2.1; see also N.J.A.C. 16:41C-8.2(a). These signs are significantly smaller than billboards and are limited in number and distance from the destination described. N.J.A.C. 16:41C-8.2. They are exempt from fees. N.J.A.C. 16:41C-7.2(d).

The regulation also addresses a separate category of off-premises signs, "service club and religious signs," which are "signs whose erection is authorized by law, relating to the meetings of nonprofit service clubs or charitable associations or religious services." N.J.A.C. 16:41C-2.1.[3] These signs must be

_____

[3] The parties have not identified a source of separate legal authority for erecting service club and religious signs.

even smaller than directional signs and are also limited in number and distance from the organization described. N.J.A.C. 16:41C-8.3(a), (b). Like directional signs, they may not be within 2000 feet of an interchange or intersection at grade. N.J.A.C. 16:41-8.3(c). The regulation expressly states that the 2000 feet is measured from the pavement widening. Ibid. Also, like directional signs, they are not subject to fees. N.J.A.C. 16:41C-7.2(d).

B.

Hartz appealed DOT's initial permit denial on two principal grounds. First, Hartz claimed that the regulatory scheme was arbitrary and capricious "as applied" to it for not considering the unique characteristics of the road and sign. Relying on an expert's opinion, Hartz argued that the proposed billboard would not significantly degrade traffic safety or aesthetic values. Hartz also argued that since the pavement widening continued for roughly a third of a mile, the 500-foot distance restriction should have been measured from the point of gore instead of the pavement widening. Second, Hartz claimed that the regulatory scheme violated its First Amendment right to free speech because the scheme treated signs differently based on content – a facial-constitutional challenge. Hartz also argued that a proper factual record was needed to decide the constitutional questions.

A-5468-16T1

The ALJ granted DOT's motion for summary decision, and recommended denial of Hartz's application.[4] The Commissioner adopted the initial decision with modifications.[5] The Commissioner approved the ALJ's finding that this court, and not the agency, is the appropriate forum for Hartz's constitutional challenge. Nonetheless, the Commissioner rejected Hartz's facial constitutional challenge to the regulatory scheme, in particular, the disparate treatment of on-premise and off-premise signs. The Commissioner held that this argument was rejected in Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 511 (1981). Furthermore, citing Advantage Media, LLC v. City of Eden Prairie, 456 F.3d 793 (8th Cir. 2006), the Commissioner held that Hartz lacked standing to challenge the constitutionality of regulatory provisions that did not apply to its conduct.

The Commissioner noted that the regulations were presumptively valid, and Hartz's challenge to the efficacy of the 500-foot limit should have been raised during notice and comment. No factual hearing was needed. The

---

[4] Hartz v. N.J. Dep't of Transp., 2017 N.J. AGEN LEXIS 207 (OAL Dkt. No. TRP 02196-16) (Initial Decision Jan. 23, 2017).

[5] In re Denial of the Outdoor Advertising Application Number 75708, New Jersey Turnpike (I-95) E. Alignment E/S, Milepost 113.8 N.R.D. Secaucus Town, Hudson Cty., 2017 N.J. AGEN LEXIS 1368 (OAL Dkt. No. TRP-02196-16) (Final Decision June 29, 2017).

Commissioner rejected Hartz's claim that its deviation from the 500-foot limit was de minimis. He also rejected Hartz's newly minted request to reopen the record so it could demonstrate that the 500-foot limit was inconsistently enforced. The Commissioner noted that Hartz should have raised the issue in opposition to DOT's summary decision motion; Hartz did not present substantial evidence of such inconsistent enforcement; and the OAL hearing was not the proper place to conduct discovery into the alleged inconsistent enforcement.

On its appeal to this court, Hartz renews and amplifies the arguments presented to the agency. Hartz contends that as applied to its permit application, the regulation's distance requirement violates Hartz's free speech rights, because it does not substantially further traffic safety or aesthetic values. Alternatively, Hartz asks for a remand at which DOT would be required to demonstrate that its regulation passes constitutional scrutiny. Hartz also contends the regulatory scheme is unconstitutional on its face, because it draws content-based distinctions that cannot survive strict scrutiny. Finally, Hartz contends that a remand is necessary to explore the alleged inconsistent enforcement of the regulations, claiming that DOT has tolerated the erection of other off-premise signs within 500 feet of an interchange. Hartz contends this demonstrates the agency acted arbitrarily and violated its right to equal protection.

## II.

### A.

Although we deferentially review agency action, we will reverse a decision that, among other things, is "arbitrary, capricious, or unreasonable" or "offend[s] the State or Federal Constitution." Univ. Cottage Club of Princeton v. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007). Although agency regulations are presumptively valid if they are within the agency's properly delegated authority, Med. Soc. of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 25-26 (1990), we shall overturn them if they violate the Constitution. However, "[n]o court should decide constitutional issues in a vacuum, in the absence of a well-developed record isolating the essential factual questions at their basis and including findings of fact." Jones v. Dep't of Cmty. Affairs, 395 N.J. Super. 632, 635 (App. Div. 2007). "When an agency's decision is not accompanied by the necessary findings of fact, the usual remedy is to remand the matter to the agency to correct the deficiency." In re Issuance of Permit, 120 N.J. 164, 173 (1990).

### B.

As our Supreme Court observed, "Different types of speech are afforded different levels of protection, and some forms of expression are beyond the

A-5468-16T1

scope of the First Amendment." E & J Equities, LLC v. Bd. of Adjustment of the Twp. of Franklin, 226 N.J. 549, 568 (2016).

Commercial speech – "expression related solely to the economic interests of the speaker and its audience" or "speech proposing a commercial transaction" – enjoys less protection than non-commercial speech. Id. at 569 (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561-62 (1980)). In assessing a First Amendment challenge to a commercial speech regulation, a court must determine whether the First Amendment protects the commercial speech. Id. at 570. The First Amendment does not protect speech that is misleading or concerns unlawful activity. Ibid. Second, the court must determine "whether the governmental interest is substantial." Ibid. (quoting Cent. Hudson, 447 U.S. at 566). "If both inquiries yield positive answers, [a court] must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." Ibid. (quoting Cent. Hudson, 447 U.S. at 566). A State may regulate the content of protected commercial speech only if it meets that test. Cent. Hudson, 447 U.S. at 566.

A similar intermediate-scrutiny evaluation of governmental ends and means applies to State regulations of the time, place or manner of speech. E &

J Equities, 226 N.J. at 570-72.  Such regulations may limit non-commercial as well as commercial speech, so long as the regulations are content-neutral and "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."  Ibid. (quoting Clark v. Cmty. For Creative Non-Violence, 468 U.S. 288, 293 (1984)). A regulation is narrowly tailored if the interest "would be achieved less effectively absent the regulation" and it does not "burden substantially more speech than is necessary."  Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989).

"Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2227 (2015).  In other words, to ascertain whether a regulation is content-based, a court must consider "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  Ibid.  Facial content-based distinctions may "defin[e] regulated speech by particular subject matter" or, more subtly, "defin[e] regulated speech by its function or purpose."  Ibid.[6]  A regulation may

[6] The Reed Court held that a regulation may be content-based on its face, even absent any governmental disagreement or ill-motive.  Id. at 2228-29.  The Court

be neutral with respect to viewpoints, but still be content-based.  Id. at 2230 (stating "it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic'") (quoting Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 537 (1980)).  Also, restrictions that favor some speakers over others may constitute content-based regulation when used to control content.  Id. at 2230.

If regulation of non-commercial speech is content-based, then it is "presumptively unconstitutional," and subject to "strict scrutiny," that is, it "may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests."  Id. at 2226-27.  In Reed, the Supreme Court characterized as "content-based" a local sign code that exempted from a general

_____

rejected the Court of Appeals' view that Ward suggests "that a government's purpose is relevant even when a law is content based on its face."  Id. at 2228.  But see E & J Equities, 226 N.J. at 571 (stating, without reference to Reed, "'[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys'" and "[w]hen courts assess content neutrality, '[t]he government's purpose is the controlling consideration'") (quoting Ward, 491 U.S. at 791).  On the other hand, the Reed Court held that "facially content neutral" laws will be considered content-based if they "cannot be 'justified without reference to the content of the regulated speech,' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'"  Reed, 135 S. Ct. at 2227 (quoting Ward, 491 U.S. at 791).

15

sign prohibition ideological, political, and temporary directional signs, among others. Id. at 2224-25. The local code defined those categories of signs on the basis of their content, and then regulated temporary directional signs more restrictively than ideological and political signs. Id. at 2224-25, 2227. Applying strict scrutiny, the Supreme Court invalidated the ordinance largely because it was underinclusive. Id. at 2231. Assuming the government had a compelling interest in promoting traffic safety and aesthetics, the government failed to show that "limiting temporary directional signs is necessary . . . but that limiting other types of signs is not." Id. at 2232.[7]

## C.

Not surprisingly, Hartz attempts to cast DOT's regulatory scheme as a content-based regulation of non-commercial speech, so as to implicate strict scrutiny. Arguably, aspects of the regulations are content-based. But, Hartz lacks standing to object to those provisions, and we do not decide the matter. The only regulation that Hartz may challenge is the provision that bars its

---

[7] In other contexts, a regulation of speech may fail strict scrutiny because it is "over-inclusive." See, e.g., Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 805 (2011) (stating that "when they affect First Amendment rights" governmental interests "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive").

proposed off-premise sign because it is less than 500 feet from the point of pavement widening.

On-premise signs are exempt from the 500-foot distance restriction and do not require permits. If that were the only distinction between the two, the different treatment would apparently not offend the First Amendment, notwithstanding that the regulation distinguishes between speakers. See id. at 2233 (Alito, J., concurring) (stating that "[r]ules distinguishing between on-premises and off-premises signs" "would not be content based");[8] see also GEFT Outdoor LLC v. Consol. City of Indianapolis, 187 F. Supp. 3d 1002 (S.D. Ind. 2016) (post-Reed, upholding disparate treatment of on-premise and off-premise signs that applied only to commercial speech).

However, on-premise signs in the DOT regulation are defined in part by their content. The regulations dictate that an on-premise sign must pertain to the "principal activity, product or service . . . of the property on which the sign is located." N.J.A.C. 16:41C-2.1. If not, it will be deemed an off-premise sign. Thus, the State must consider the content of a sign to determine whether it qualifies as an on-premise sign.

---

[8] Justice Alito wrote for himself and Justices Kennedy and Sotomayor. Without those three, the opinion of the Court by Justice Thomas, joined by Chief Justice Roberts and Justice Scalia, lacked a majority.

The court in <u>Thomas v. Schroer</u>, 248 F. Supp. 3d 868, 879-80 (W.D. Tenn. 2017) concluded that such a regulation triggered strict scrutiny, because it "requires one to assess the sign's content to determine if it is exempt."[9] For example, under such a regulation, the owner of a qualifying premise may not erect an on-premise sign to endorse a political candidate (unless the premises were the candidate's campaign headquarters). <u>See</u> <u>Auspro Enters., LP v. Tex. Dep't of Transp.</u>, 506 S.W. 3d 688 (Ct. App. Tex. 2016) (invalidating a restriction that prevented a party from maintaining a Ron Paul 2012 election sign on its property), <u>vacated as moot</u>, No. 17-0041, 2018 Tex. LEXIS 298 (Apr. 6, 2018). A sign with political or ideological content unrelated to the premise's activity, product or service would be deemed an off-premise sign, even if it is actually located on the owner's premises. It would then be subject to the permit requirements, and the distance restrictions applicable to off-premise signs.

---

[9] According to the court in <u>Thomas</u>, Justice Alito's concurrence in <u>Reed</u> understood the off-premise and on-premise dichotomy in a content-neutral manner. For instance, "a regulation that defines an on-premise sign as any sign within 500 feet of a building is content neutral." <u>Thomas</u>, 248 F. Supp. 3d at 879. This presumption seems at odds with the extensive history of billboard regulations in the country. <u>See, e.g.</u>, <u>Metromedia</u>, 453 U.S. at 494 (considering a law that defined onsite signs as those "designating the name of the owner or occupant of the premises upon which the signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed").

DOT's regulations treat directional, service club and religious signs more and less favorably than other off-premise signs. The signs are described in terms of their content. These three kinds of signs are exempt from fees. However, they are subject to less favorable size and spacing requirements. And they are subject to more expansive distance restrictions than applies to other off-premise signs; they must be at least 2000 feet from the point of pavement widening.[10]

We need not assess whether these restrictions offend the First Amendment, because they cause Hartz no injury; therefore, Hartz lacks standing to challenge them. We recognize that New Jersey standing law is more liberal than federal law. Salorio v. Glaser, 82 N.J. 482, 490 (1980) ("New Jersey State courts are not bound by the 'case or controversy' requirement governing federal courts."). Nonetheless, a party asserting standing must show a "sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event

---

[10] We reject Hartz's contention that the directional signs may be located within 2000 feet of the point of gore, which would allow their placement closer than signs like Hartz proposed, which would be 500 feet from the pavement widening, but 2200 from the point of gore. As we discussed above, we conclude – in the absence of an explicit indication of how to measure the 2000-foot distance from an interchange, intersection at grade, or safety service area – that the 2000-foot distance would be measured from the point of pavement widening, to be consistent with the federal standard, which the State obviously intends to satisfy. See 23 C.F.R. 750.154; N.J.A.C. 16:41C-8.2(f), (g)(2).

of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002); see also In re Martin, 90 N.J. 295, 308 (1982) (stating that standing to challenge a statute's constitutionality requires plaintiffs prove "they have been injured by enforcement of the statute or that the statute substantially deters their constitutionally protected activity").

Standing must be established for each claim Hartz asserts. See DaimlerChrylser Corp. v. Cuno, 547 U.S. 332, 352-53 (2006) (stating that "a plaintiff must demonstrate standing for each claim he seeks to press"). Also, standing will be denied if the litigant merely asserts the rights of a third party or asks the court to render an advisory opinion. Goldman v. Critter Control of New Jersey, 454 N.J. Super. 418, 424 (App. Div. 2018).

We recognize that the First Amendment must have "breathing space" and may permit a plaintiff to litigate the rights of others whose speech may be chilled by an overbroad restriction of speech, even if the plaintiff's own speech could be appropriately restricted under a more narrow statute. See Broadrick v. Oklahoma, 413 U.S. 601, 611-16 (1973); N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n, 82 N.J. 57, 68-69 (recognizing expanded standing in First Amendment cases) (citing Broadrick). Flexibility is granted because of a "judicial prediction" that "protected speech of others may

[otherwise] be muted and perceived grievances left to fester." Broadrick, 413 U.S. at 612. In New Jersey, a "strong public interest" may justify consideration of a case, even where the plaintiff's private interest is slight. N.J. State Chamber of Commerce, 82 N.J. at 68-69.

In Metromedia, the Court noted that it had "never held that one with a commercial interest in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment rights of others." 453 U.S. at 504 n.11.

However, in Metromedia, the parties stipulated that the challenged ordinance would have caused plaintiffs an extreme injury – the elimination of outdoor advertising in San Diego. Id. at 497. Absent such a far-reaching stipulation, the plaintiff must demonstrate standing to assert its own claim of constitutional injury in order to assert infringement of others' rights. See Get Outdoors, IL LLC v. City of San Diego, 506 F.3d 886, 892 (9th Cir. 2007) (stating that plaintiff has "standing to challenge only those provisions [of the sign ordinance] that applied to it"); Midwest Media Prop., LLC v. Symmes Twp., Ohio, 503 F.3d 456, 463 (6th Cir. 2007) (stating that overbreadth doctrine "does not excuse a party's failure to 'allege an injury arising from the specific rule being challenged, rather than an entirely separate rule that happens to appear

21

in the same section of the municipal code'" (quoting Prime Media, Inc. v. City of Brentwood, 485 F.3d 343, 351 (6th Cir. 2007))); CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1273 (11th Cir. 2006) (requiring a "plaintiff to establish injury in fact as to each provision").

We reach the same conclusion here. The restriction of non-commercial, non-premise-related speech by premise owners does not affect Hartz's proposed billboard application. Hartz suffered no injury here from the allegedly content-based restriction of on-premise signs, and lifting the limitation on non-premise-related speech by premise owners would not benefit Hartz. Rather, the prohibition of non-premise-related speech on what would otherwise qualify as an on-premise sign might inure to Hartz's benefit. The regulation removes a competitive source of messages that would otherwise enjoy more favorable treatment than Hartz's off-premise location.

We also discern no compelling public interest to address the claimed restriction of the First Amendment rights of on-premise sign owners. Walmart, for example, which conceivably could erect its own on-premise sign on or near the site in question, is surely capable of bringing its own challenge. Cf. Anderson v. Sills, 56 N.J. 210, 220 (1970) (stating "there is good reason to permit the strong to speak for the weak or the timid in First Amendment

matters"). We are also guided by principles of constitutional avoidance. Donadio v. Cunningham, 58 N.J. 309, 325-26 (1971) ("[A] court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation.").

We reject on the same lack-of-standing grounds, Hartz's facial challenge to the directional, service club, and religious signs. Directional signs are limited to certain speakers – operators of qualifying destinations – and the content of their speech is limited to providing directions to their sites. Similarly, service clubs and religious organizations are limited to messages related to such entities. But, Hartz is not injured by the special treatment of these signs.

In sum, we hold that Hartz lacks standing to challenge the allegedly content-based regulation of on-premises, directional, service club and religious signs.

D.

We turn to Hartz's challenge to the 500-foot regulation as applied. The regulation is not a regulation of the content of commercial speech, which would be governed by the Central Hudson standard. It does not distinguish between commercial and non-commercial messages on off-premise signs. Rather, it is a content-neutral time, place or manner restriction – specifically, the place where

a sign may be located. The regulation prohibits off-premise signs within 500 feet of pavement widening. It matters not whether the sign carries a purely commercial message, or a non-commercial one.

Thus, the Ward/Clark intermediate-scrutiny test applies. As we have discussed, the regulation must serve a significant governmental interest; it must be narrowly tailored to that interest; and the regulation must preserve ample alternative means for communicating the information.

DOT has identified a governmental interest in traffic safety. That interest, (along with aesthetics, which is not an issue here because the proposed billboard would be on an existing structure), has "long been recognized as a legitimate and substantial government interest[], particularly related to billboards." E & J Equities, 226 N.J. at 583; see also Metromedia, 453 U.S. at 507-08 (holding that traffic safety is a "substantial government goal[]"). However, the State must also show how the regulation promotes or serves that interest in traffic safety. "When a governmental entity restricts speech, it must do more than simply invoke governmental interests that have been recognized over time as substantial. . . . [T]here must be a modicum of support for the invoked government interest." E & J Equities, 226 N.J. at 583.

To meet the narrow tailoring requirement, DOT must demonstrate that traffic safety "would be achieved less effectively" without the regulation. Id. at 582 (quoting Ward, 491 U.S. at 799). DOT's regulation "may not substantially burden more speech than necessary to further the government's legitimate interests." Ibid. (quoting Ward, 491 U.S. at 799). Identification of a less restrictive alternative does not doom the regulation. Ibid.

In E & J Equities, the court considered the constitutionality of a township ordinance that prohibited digital billboards but permitted other billboards in the same zone. 226 N.J. at 557. The township invoked interests in public safety and aesthetics. But the Court did not think the "record founded only on suppositions, fears, and concerns" adequately demonstrated that the speech restriction promoted those interests. Id. at 585.

Here, the ALJ did not conduct an evidentiary hearing and the Commissioner did not think one was necessary. The State argues that the regulations went through notice and comment and thus enjoy a presumption of validity. Med. Soc. of N.J, 120 N.J. at 25-26. However, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." United States v. Playboy Ent. Grp., 529 U.S. 803, 816 (2000). Although the regulatory history includes pronouncements of

DOT's intent to promote traffic safety, DOT points to no evidence in the record that the 500-foot limit, particularly as applied to a pavement widening roughly a third of a mile from an exit ramp, contributes to that goal.

We postulate that anywhere a significant number of motorists are prone to shift lanes or to speed up or slow down, the risk of accidents increases, and reducing distractions may be important. One such area may be where a roadway suddenly expands from three to five lanes, and some motorists try, at the same time, to shift lanes. Thus, Hartz may miss the point in highlighting the distance of the pavement widening from the point-of-gore. The risk may arise from the pavement widening itself, not its proximity to the exit ramp.

However, it is not for us to hypothesize the basis for the 500-foot limit from pavement widenings. To satisfy intermediate scrutiny of DOT's time, place and manner restriction, DOT is obliged to present evidence that the 500-foot limit furthers the State's interest in traffic safety. We have little doubt that the regulation preserves ample alternative means of communicating messages, inasmuch as off-premise billboards are permitted on extensive areas of the Turnpike outside the no-sign zones.

We add that DOT's evidence need not necessarily be rigorous or unchallenged to survive a constitutional challenge. Courts can consider "[a]

long history, a substantial consensus, and simple common sense" to show that a law is necessary to advance the governmental interest. Burson v. Freeman, 504 U.S. 191, 211 (1992). The Metromedia Court did not reject "the accumulated, common-sense judgments of . . . lawmakers and of many reviewing courts that billboards are real and substantial hazards to traffic safety" when there was "nothing . . . to suggest that these judgments [were] unreasonable." 453 U.S. at 509; see Burns v Barrett, 561 A.2d 1378, 1382-84 (Conn. 1989) (affirming trial court finding that 500-foot restriction advances state interest in traffic safety based on testimony of State's chief transportation engineer and "accumulated common-sense judgments" (quoting Metromedia, 453 U.S. at 509)).

We conclude the distance requirement could survive intermediate scrutiny "so long as whatever evidence the [government] relie[d] upon [was] reasonably believed to be relevant to the problem that the city addresses," traffic safety. Interstate Outdoor Advert., LP v. Zoning Bd. of Twp. of Mount Laurel, 706 F.3d 527, 533-34 (3d Cir. 2013) (quoting Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52 (1986) (emphasis omitted)) (considering a local ordinance that restricted billboard placements).

Nor must DOT justify, with absolute precision, its adoption of a 500-foot limit, and not, say, a 350-foot limit, particularly in cases like this, where

pavement widening begins far from the exit. See Prime Media, Inc. v. City of Brentwood, 398 F.3d 814, 823-824 (6th Cir. 2005) ("To ask the City to justify a size restriction of 120 square feet over, say, 200 square feet or 300 square feet would impose great costs on local governments and at any rate would do little to improve our ability to review the law . . . ."); Hucul Advert., LLC v. Charter Twp. of Gaines, 748 F.3d 273, 279 (6th Cir. 2014).

In sum, we remand so that the State can have an opportunity to meet its burden in a hearing before the Office of Administrative Law (OAL), and show that the regulation promotes a governmental interest.

E.

Finally, we briefly address Hartz's claim that DOT has allowed, or failed to enforce the 500-foot distance restriction on numerous other billboards in the State. Hartz argues that it should be able to present these facts to challenge the regulation. We agree. Proof of lax enforcement may undermine DOT's argument that the distance requirement is narrowly tailored to promote the State's interest in public safety. Also, although Hartz does not amplify the basis of its equal protection challenge, we understand Hartz to allege a "class-of-one" claim that DOT has intentionally treated it differently from other sign-owners without a rational basis for doing so. See, e.g., Radiation Data, Inc. v. N.J. Dep't

of Envtl. Prot., 456 N.J. Super. 550, 561-62 (App. Div. 2018) (describing elements of class-of-one equal protection claim). These facts may and should be developed before OAL and the agency. See N.J. Dep't of Envtl. Prot. v. Huber, 213 N.J. 338, 373-74 (2013) (stating that administrative agencies may address constitutional issues that are relevant and necessary to resolving questions within its jurisdiction).

Remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION